HALL, Judge.
Mrs. Francesca Papa Zuccarello, a sister of decedent, and Mrs. Antoinette Papa Monteverde, a niece, daughter of a predeceased brother, filed this suit seeking to annul the last will and testament of Salvatore (Sam) Papa. From a judgment upholding the will and dismissing their suit Mrs. Antoinette Papa Monteverde prosecutes this devolutive appeal. Mrs. Zuccar-ello did not appeal it being conceded that she is too old and senile to take part in the proceedings.
Salvatore (Sam) Papa died in the City of New Orleans where he had his residence and domicile, on April 6, 1965. At the time of his death he was approximately 87 years old. He had never married and left no surviving descendents or ascendants. The last will and testament of the deceased, under attack in these proceedings, is a nuncupative will by public act before Alcide J. Weysham, Notary Public, dated March 6, 1965, in which the decedent bequeathed all of his property and effects to Mrs. Beatrice Papa Viola, a niece, (sister of Mrs. Monteverde, one of the plaintiffs herein) and named her testamentary exec-trix of his estate.
Mr. Papa’s succession was opened on April 7, 1965, on the petition of Mrs-Beatrice Papa Viola; the will was ordered executed, and Mrs. Viola qualified as testamentary executrix. An inventory of decedent’s property revealed a gross estate valued at $112,127.60.
On April 15, 1965 plaintiffs filed a petition seeking to annul the will on the ground that on the 6th day of March, 1965, the date the will was executed, the decedent lacked testamentary capacity “due to his unsoundness of mind and body.” By supplemental petitions plaintiffs alleged as an additional ground of nullity that the will was not dictated by the testator nor written by the notary on March 6, 1965 at 7:20 P.M. as indicated by the date and time recited in the will. No attack was made on the formal validity of th'e will and.it appears *856 on its face to comply with all of the formalities prescribed by the Civil Code.
Following a lengthy trial the District Judge held: (a) that the will was duly executed on the 6th day of March, 196S, and (b) that the deceased possessed testamentary capacity at the time the will was made.
The will contains a recitation that it was executed on March 6, 1965 at 7:20 P.M. Appellant’s primary contention is that it was not executed on that date and at that time. Alternatively appellant contends that on that date and at that time the testator lacked the necessary testamentary capacity to understand and appreciate the nature of his act.
For better understanding it is necessary to state briefly the background of the case. In March of 1963 the testator was the victim (for the second time) of a robbery during which he received such an unmerciful beating as to require prolonged hospitalization and extensive care. Though his recovery was very successful his personal physician for forty years, Dr. Emanuel F. Salerno, suggested that it would be best for Mr. Papa’s safety that he not continue to live alone but that he be placed in a home for the aged where he would be taken care of and protected. Acting on this suggestion, Mrs. Viola, who had been tending to all his business affairs, made arrangements to have her uncle placed in the Plantation Nursing Home. Dr. Salerno continued to visit him there from time to time and Mrs. Viola tended to his affairs under a power of attorney.
In the early morning of the 18th of February, 1965, Mr. Papa became very ill. Dr. Salerno was summoned and had Mr. Papa admitted to the Hotel Dieu hospital' where it was determined that he was hemorrhaging internally in addition to having gall stones and other organic troubles. The hemorrhaging was treated with coagulants and blood transfusions but it continued to reoccur causing fluctuation in his blood pressure. The site of the hemorrhage-could not be determined and Dr. Salerno' called in Dr. Gatto, a psychiatrist, and Drs. Llewellyn and Richardson, neurosurgeons, to see if any cerebral condition was causing it. Their examination was-negative. He also called in Dr. Krementz, a cancer specialist, to see if Mr. Papa had any abdominal or stomach cancer which was causing the hemorrhage. Dr. Kre-mentz’s examination was also negative.
Mr. Papa remained in Hotel Dieu from-February 18th to the date of his death on April 6, 1965. His hospital chart shows that throughout that time the hemorrhaging reoccurred time and time again and that during a hemorrhage his blood pressure would drop very low but after receiving a transfusion it would pick up. Glucose was also administered intravenously and an oxygen tent was ordered for the patient.
-1-
Appellant’s attack on the date of the will is based entirely on Mr. Papa’s hospital chart which contains the notation that an oxygen tent was ordered for him on March 4th and contains no notation that it was removed before March 7th. The chart also shows that he was receiving an intravenous transfusion between 7 and 8 P.M. on March 6th.
The notary and the three witnesses to the will testified that the will was executed between 7 and 8 P.M. on March 6th; that at the time the will was dictated and signed Mr. Papa was not under the oxygen tent, the hood having been pushed back toward the head of his bed. The notary and two of the witnesses to the will also testified that whereas there was an infusion rack in the room, they do not recall Mr. Papa receiving an infusion or transfusion at the time. On the other hand one of the witnesses to the will stated that as far as she could remember, Mr. Papa was receiving an infusion at the time.
Appellant’s sole contention in this respect is that since the chart shows the oxygen tent was not removed until the following *857 •day and since it shows he was receiving a transfusion between 7 and 8 P.M., the testimony of the notary and the witnesses to the will that Mr. Papa was not under an oxygen tent when the will was executed leads to the conclusion that the will was not made on the date and at the hour stated therein.
Appellant adduced the testimony of two registered nurses and a licensed practical nurse who were on duty during Mr. Papa’s illness in an effort to show Mr. Papa was constantly under the oxygen tent from March 4th to March 7th and that he was receiving a transfusion between 7 and 8 P.M. on March 6th.
None of the nurses had any independent recollection of the facts and based their testimony entirely on the notations made by them on the chart. Dr. Lucio E. Gatto who saw Mr. Papa between 5 and 6 P.M. recalled that the patient was under the oxygen tent at that time.
The fact remains that no one was present in Mr. Papa’s room between 7 and 8 P.M. on March 6th except the notary and the three witnesses to the will and their testimony is positive that at that time the patient was not receiving oxygen.
The District Judge found as a fact that Mr. Papa was not under the oxygen tent when the will was confected although he may have been receiving a blood transfusion. We find no error in these conclusions.
The recitals of a nuncupative will by authentic act must be considered as proved until disproved. (See LSA-C.C. Art. 1647; Succession of Block, 131 La. 101, 59 So. 29; Succession of Beattie, 163 La. 831, 112 So. 802; Bernard v. Francez, 166 La. 487, 117 So. 565; Renfrow v. McCain, 185 La. 135, 168 So. 753; Succession of Prejean, 224 La. 921, 71 So.2d 328; Succession of Talluto, widow of Spatafora, 239 La. 326, 118 So.2d 427; Succession of Watson, La.App., 157 So.2d 612.)
In our opinion plaintiffs have signally failed to overcome the presumption that the will in contest was executed on the date and at the hour recited therein.
-2-
Plaintiffs’ alternative contention that the testator did not possess testamentary capacity between 7 and 8 P.M. on March 6, 1965 is in our opinion equally untenable.
Their contention is based entirely upon expert testimony given by Dr. Sidney Jacobs, an internist. Dr. Jacobs had never seen the testator, and testified solely from Mr. Papa’s medical chart. Dr. Jacobs testified that the chart indicated that on March 6, 1965, Mr. Papa’s blood pressure had dropped from 100/60 at 8 A.M. to 84/40 at 5 P.M.; that between 5 and 6 P.M. Mr. Papa had a hematocrit value of 18%; a hemoglobin value of 5.9 grams; a blood nitrogen of 48; and that he had received an injection of Vesprin at 6 P.M. Based on these and other factors found in the chart Dr. Jacobs testified that in his opinion Mr. Papa’s physical condition was such that in his opinion Mr. Papa would have been unable between the hours of 7 and 8 P.M. of March 6th to reason properly or to know what he wanted to do with his property.
Dr. Ralph M. Plartwell was placed on the stand by the defendant executrix as an expert in the field of pathology. Dr. Hartwell had likewise never seen Mr. Papa, and while he was unwilling to give his opinion as to Mr. Papa’s mental capacity, stating that this was out of his field, he did disagree with most of the medical conclusions reached by Dr. Jacobs.
Dr. Lucio E. Gatto, a specialist in the field of psychiatry and a consultant in other fields of medicine, who testified on behalf of the defendant, stated that he examined Mr. Papa between the hours of 5 and 6 P.M. on March 6, 1965, his examination lasting approximately twenty-five minutes. He stated that he gave *858 -Mr. Papa a complete neurological examination 'and found him mentally alert at that time and capable of recognizing situations and making decisions. He further testified that he was definitely of the opinion that Mr. Papa was fully capable of making a will between 7 and 8 P.M. provided there had been no change in his condition from what it was when he saw him at about 5:30 P.M. In this regard the medical chart shows that Mr. Papa’s condition actually was improving somewhat by 8:30 P.M.
Dr. E. F. Salerno testified that he had been Mr. Papa’s physician for forty years and knew thoroughly Mr. Papa’s physical and mental condition. He testified that Mr. Papa had a good clear mind and would have been able to make a valid will until March 24, 1965 when his Condition became worse and he told Dr. Salerno in a conversation with him in Italian, “the ship is sinking.” While Dr. Salerno became ill on March 4th and did not see his patient again until March 15, he reviewed his chart and, contrary to Dr. Jacobs, found nothing therein to suggest that Mr. Papa was incapable of making a will on March 6th.
None of the three nurses called to the stand by plaintiffs testified that Mr. Papa’s mind was not clear on the evening of March 6th. As a matter of fact none of them had any independent recollection of the case but testified only as to notations made by them on Mr. Papa’s chart.
Plaintiffs called the notary and the three witnesses to the will for cross-examination under the Act. They described in detail how the will was made, and their testimony leaves no doubt that Mr. Papa’s mind was clear; that he knew what he was doing and how he wished to dispose of his property.
Appellant makes much of the fact that the defendant did not subsequently call the notary and witnesses under direct examination to testify specifically as to Mr. Papa’s mental condition. In view of their testimony under cross-examination and also-in view of the burden of proof borne by appellant we are of the opinion that no-presumption adverse to ^defendant flows-from the failure to call them for direct examination.
We find it unnecessai-y to detail the testimony of other witnesses called by the-defendant.
The record reveals that Mrs. Viola to-whom Mr. Papa left all of his property was very close to him. While he was in the Plantation Nursing Home she tended' to all of his affairs under a power of attorney. She collected the rent from his-property. She saw that the necessary repairs were made; she paid the taxes and insurance, and handled all of his money. When he was taken to Hotel Dieu she saw that he had proper medical and nursing care. On the other hand, Mrs. Monte-verde, the appellant herein, saw her uncle-only three times during his stay at the nursing home; she did not visit him at all after he moved to Hotel Dieu, her excuse being that she was sick; she did not attend his wake, nor his funeral. It is clear that Mrs. Viola was much closer to the testator than her sister, Mrs. Monteverde,. and it does not appear unusual that he-bequeathed his property to her.
A testator is presumed to be sane at the time a will is made, and the presumption of a testator’s sanity and mental capacity can only be overcome by cogent and convincing evidence. (See Succession of Schmidt, 219 La. 675, 53 So.2d 834; McCarty v. Trichel, 217 La. 444, 46 So.2d 621; Succession of Talluto, widow of Spatafora, 239 La. 326, 118 So.2d 427.)
One who attacks a will on the ground of lack of testamentary capacity has the burden of proof. (See Succession of Holland, 236 La. 8, 106 So.2d 697.)
Testamentary capacity is a question of fact (See Succession of Herson, *859 La.App., 127 So.2d 61) and a Trial Court’s findings of fact will not be disturbed unless there is manifest error. (See Dane v. Canal Insurance Company, La.App., 116 So.2d 359 and cases there cited.)
The Trial Court said in his written '“Reasons for Judgment”:
“It is the opinion of the court the record shows that Mr. Papa possessed the testamentary capacity at the time the will was made to make the same; that he was able to comprehend the ■condition of his property and his relation to those who may naturally expect to become the object of his bounty.”
In our opinion the record fully substantiates- the findings and conclusions of the Trial Judge.
For the foregoing reasons the judgment appealed from is affirmed; costs of this appeal to be borne by appellant.
Affirmed.